**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The HERTZ CORPORATION, Respondent.**

No. 71–1444

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Oct. 20, 1971.

* [1] Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Clifford Potter, Director, N. L. R. B., Region 23, Houston, Tex., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Robert E. Williams, Avrum M. Goldberg, Attys., N. L. R. B., for petitioner.

C. Dale Stout, New Orleans, La., Kullman, Lang, Keenan, Inman & Bee, New Orleans, La., for respondent The Hertz Corporation.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

This case is before us on the application of the National Labor Relations Board pursuant to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160, for enforcement of the Board's order of July 7, 1970 against the Hertz Corporation (Houston operations). 184 N.L.R.B. No. 49. The Board ordered Hertz to cease and desist from unfair labor practices found and from interfering with or coercing employees in the exercise of their rights to self-organization in any other way. The Board also ordered Hertz to offer Pamela Yingling and Melva Martin immediate and full reinstatement to their former jobs; to compensate them for any loss of pay suffered; to preserve records as to back pay and the right of employment under the order; and to post appropriate notices. The question before us is whether there is "substantial evidence on the record considered as a whole," 29 U.S.C. § 160, to support the Board's findings of fact that Hertz interfered with, restrained, and coerced its employees in violation of section 8(a)(1) of the Act, and, further, that Hertz discriminatorily discharged employees Pamela Yingling and Melva Martin in violation of section 8(a)(3) and (1) of the Act. On the basis of the record before us, we conclude that there is substantial evidence to support the Board's findings, and we therefore enforce the Board's order.

In section 10 of the National Labor Relations Act, Congress limited our power of judicial review of labor disputes such as the one before the Court: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160. See Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951).

The Board found that Hertz violated Section 8(a)(1) of the Act by granting wage increases or economic benefits to employees to discourage union [1] activity, see, N.L.R.B. v. Rexall Chemical Company, 5 Cir., 1969, 418 F.2d 603, cert. denied, 397 U.S. 1065, 90 S.Ct. 1503, 25 L. Ed.2d 686 (1970); N.L.R.B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). Hertz Vice President Burns arrived at the Houston operation on December 18, 1968, the day before a wage increase was effected.

[1] The International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

The Union's organizational campaign had begun about one month prior to December 18. On December 19, 1968, Burns raised the wages of all non-union employees to a parity with certain employees of Hertz already represented by the Union. The Board found that Burns' desire to increase wages was prompted by a desire to dissuade employees from engaging in union activity and not, as the Company contended, in accordance with "established practice." Cf. Kellwood Company, Ottenheimer Bros. Mfg. Div. v. N.L.R.B., 8 Cir., 1969, 411 F.2d 493. Moreover, the Company's notion that certain "discussions" of the raises with employees constitutes "free speech" protected by Section 8(c) does not comport with the granting of pay raises under the circumstances here.

The Board likewise found violations of Section 8(a) (1) resulting from threats that conditions of employment would be more onerous if the Union were elected, see N.L.R.B. v. Texas Industries, Inc., 5 Cir., 1970, 426 F.2d 812. There is substantial evidence that Vice President Burns threatened to enforce work rules more strictly if the employees chose the Union. Similarly, there is substantial evidence that Burns interrogated employees as to the identity of pro-union employees and that the Company threatened to discharge employees because of their union activities, all in violation of Section 8(a) (1), see N.L.R.B. v. Varo, Inc., 5 Cir., 1970, 425 F.2d 293. On December 19, 1968, several weeks before the Union election, Burns talked with Melva Martin. Martin identified certain employees (Yingling and Cramer) as being in sympathy with the Union. She testified that Burns stated, "Well, is there any reason why we can't fire these girls now?" Burns denied ever having said this. The Trial Examiner and the Board resolved the conflict in testimony against the Company and we discern no error in the Board's choice "between two fairly conflicting views." Universal Camera Corp. v. N.L.R.B., 340 U.S. at 488, 71 S.Ct. at 465.

The Board also found violations of Section 8(a) (1) and (3) in the discriminatory discharges of employees Pamela Yingling and Melva Martin. Yingling was clearly in sympathy with the Union's organizational drive. Burns learned of her involvement in the conversation with Martin. Moreover, when interviewed by Burns, Yingling told him that employee morale was down in Houston and wanted to know what would be done about it. The very next day Yingling was discharged by Hertz, allegedly because she had abused her sick leave privileges. Hertz offered the testimony of Burns, City Manager Perkins and Assistant City Manager Babbitt to establish that the sole reason for Yingling's discharge was her absence for two days under the pretense of being sick. The Trial Examiner found that Yingling had abused the sick leave privilege, but that the sole reason for Yingling's discharge was her Union activity. The Trial Examiner found, and the Board affirmed, that the sick leave defense was a mere afterthought and did not represent the true motivation of the Company. We agree with the Board after careful examination of the record as a whole.

The case of Melva Martin is closer. Martin was a long-time employee of Hertz. She had a job which she liked and which she performed to everyone's satisfaction. She had a foot injury which required her to wear a special medical shoe. The injury did not hamper fulfillment of her responsibilities. The Company transferred Martin to a new position outside of the bargaining unit, allegedly because the employee she was replacing was ill. Martin, it was asserted, was well trained and qualified for the new job. Originally, Martin agreed to the transfer, assuming that she would be re-transferred to her old position when the sick employee returned. Subsequently, however, Perkins told her that the transfer was permanent. When she objected and refused to be permanently transferred, she resigned. Perkins testified that she would have been discharged for her

refusal in any event. In her old position, Martin travelled to work with her husband every morning. The new job, however, entailed an additional 30 miles of travel each day to get to work.

An employer violates section 8 (a) (1) and (3) of the Act if he transfers an employee from one position inside the bargaining unit to another less desirable position outside the bargaining unit, if the transfer results from such an employee's union activities. See Food Store Emp. U., Loc. No. 347, Amal. Meat Cut., etc. v. N.L.R.B., 1969, 135 U.S. App.D.C. 341, 418 F.2d 1177, or is intended to discourage membership in a labor organization, N.L.R.B. v. White Superior Division, White Motor Corp., 6 Cir., 1968, 404 F.2d 1100. On the other hand, it is an inherent power of management to transfer employees as efficiency demands. Macy's Missouri-Kansas Division v. N.L.R.B., 8 Cir., 1968, 389 F.2d 835.

For this reason we have long recognized that "a finding of a Section 8(a) (3) violation will normally turn on the *employer's* motivation." (Emphasis supplied.) N.L.R.B. v. Brennan's, Inc., 5 Cir., 1966, 366 F.2d 560, 564, citing N.L.R.B. v. Great Dane Trailers, Inc., 5 Cir., 1966, 363 F.2d 130. In *Brennan's, Inc.,* supra, this Court upheld management's transfer of an employee within the bargaining union from one floor to another in a restaurant: "We are of the opinion, therefore, that the placing of LaFleur in a different serving locale, was a justifiable management prerogative, if done for the proper reason, as punishment for his conduct." 366 F.2d at 565.

The Trial Examiner below found that Hertz was justified in discharging Martin because at the time of the transfer Burns and Perkins did not know of Martin's alleged Union activities. Moreover, the Examiner found that the Company's explanation of the transfer was reasonable. The Board reversed with one member dissenting. Its decision rested largely on Martin's testimony to

the following effect: " * * * Mr. Burns, in our conversation there, he just said that—'Well, if you want a union in here, you will damn sure live by it.' He says, 'If you are late three times, I will fire you.' And he said, 'A union couldn't keep him from firing anybody if he wanted to fire somebody.' " The Board's conclusion was further supported by parts of the record which the Trial Examiner failed to consider in any way. We, of course, are bound to consider the whole record as the Board did. The key testimony on which the Board relied, in addition to Martin's, was that of Herbert Wells, an employee of Hertz. His testimony goes to the heart of the case before the Court. Wells had a conversation with Perkins in which Perkins stated, with reference to Martin, that he "would like to move anyone away from the counter and separate from the counter any troublemakers." Perkins never denied having made the statement. The Board reasonably concluded that the "troublemaker" referred to was Martin and that the "trouble" causing her removal was her suspected union activity.

Furthermore, the Board found that there was no reasonable "management" basis for Martin's transfer. The Company argues that there was a need for Martin in the new location. But the record shows that the new job to which Martin was to have been transferred was never filled even when the sick employee returned. Moreover, the Board found that "the record reveals that the job Respondent was creating involved considerably more than just the work with which Martin was familiar." Hertz offered testimony to show that there had been 26 transfers during the previous 5 years. But there is substantial evidence to support the Board's conclusion that "it is clear that the record failed to show another instance where a long standing [sic] employee was transferred under similar circumstances."

Finally, Hertz argues that the evidence clearly supports the notion that Martin was not even involved with the Union, and that there would therefore

have been no reason for the Company to transfer her on that account. Even if Martin's "non-activity" were the case,[2] this alone is not decisive of the Company's motivation for the transfer. The motivation and conduct being tested here is the Company's—not Melva Martin's. There is substantial evidence on the record as a whole to support the Board's finding that the Company, through Burns and Perkins, believed Martin was engaged in Union activities, and while laboring under that belief, discriminatorily transferred Martin, forcing her to resign or be discharged.

The Board's order is enforced.

2. Martin in fact signed a Union authorization card on January 31, 1969, about a week before her transfer on February 6, 1969.