OPINION OF THE COURT
John A.K. Bradley, J.
Among the many mundane cases that pass through this courtroom, occasionally a case more likely found in Hollywood than in New York Supreme Court arises. This is such a case, involving, among other things, high-priced call girls and a tony *468 escort service, an allegedly corrupt senior police officer, a vengeful gun dealer and lover, relationship abuse, bigamy, alleged prosecutorial persecution, and much more. Before the court are a number of motions designed to parse through this exciting fact pattern and have this court rule on the efficacy of this prosecution for falsifying business records, money laundering, and promoting prostitution.
FACTS
According to the defendants, Zerin, a well-known Manhattan gun dealer, obtained the services of Stacey Miller, an escort, from the Crown Club, Ltd., an outcall escort service. He began to date her outside the service. Zerin married Miller, but apparently did not reveal that he was still married to another woman at the time. Zerin began to physically abuse Miller, necessitating cosmetic surgery. When Miller threatened to leave, he threatened her with Ms contacts in the police department, saying that he would have her escort service prosecuted for prostitution activities. He told her she and Sue Keller, the alleged madam, would be arrested if she moved out. One of Zerin’s closest friends was Charles Luisi, Deputy Commander of Detectives for Manhattan South. LMsi was allegedly receiving illegal gratuities from Zerin, and has resigned from the force.
Zerin searched and seized Miller’s personal records, purportedly after being advised by Luisi to do so. When Miller moved out, Zerin demanded back a watch he had given as a gift; she refused but wrote a check for the watch, which she subsequently stopped. He filed a criminal complaint based on the stopped check.
Zerin gave the records he took from Miller to Luisi, who conducted a personal, and allegedly unauthorized, investigation. He sent the case to the District Attorney’s Office Squad (DAOS). Luisi put Zerin together with the investigators and attended meetings, without revealing that Zerin had married Miller, and was having a domestic dispute with her. Allegedly, under Luisi’s influence, regular DAOS procedures and safeguards were not followed. Purportedly, information was continually leaked by the authorities to Zerin so that he could harass Miller. Purportedly, Miller was improperly detained in connection with the alleged theft of the watch, deprived of her right to counsel, and pressured to testify against others. Miller was ultimately told to surrender on this charge. When the marriage came to light, the arrest was quietly squelched.
*469 Subsequently, Grand Jury subpoenas were issued for Keller’s credit card records, and a search warrant obtained. The media was waiting at her apartment when the warrant was executed. Allegedly, the police tipped off the media. The press allegedly reported secret information in sealed affidavits and warrants.
FALSIFYING BUSINESS RECORDS
The defendants assert that counts six and seven of the indictment, which charge the three defendants with falsifying business records in the first degree, must be dismissed. Defendants assert that this crime requires that a defendant create materially false business records and submit them knowing of their material falsity. While the People have no objection to the dismissal of these counts as to defendant C&A Holding Corporation, because they had nothing to do with the payments to American Express discussed below, they oppose the motion as to the other defendants. In this regard, the People allege that the People must merely show that the defendant falsified a business record with intent to defraud, and that intent to cause pecuniary loss to the recipient of the document is not required.
These counts charge the defendants with submitting fraudulent charge slips to American Express for payment. Defendants instructed their escort employees to list “limousine service” instead of sexual services on the charge slips. The imprint swiped was for Elegance Limousine, and the charge slip indicated it was for “limo” service. Monies received were deposited in Elegance Limousine’s account and then moved to defendant Carlyle. There is no suggestion here that defendants were trying to deprive American Express of money or property. Their intention was for American Express to obtain their usual remuneration for a credit card transaction, and there is no evidence that they did not.
It is well settled that the falsity of the document involved must go to the effectiveness of the writing. (People v Altman, 83 Misc 2d 771; People v Heller, 184 AD2d 657, lv denied 80 NY2d 930.) The defendants did not intend for American Express to be deceived by the writing. They knew and expected that the particular falsity of this writing would be of no moment to American Express. It was only the spouse or other personal or business associates of the defendants’ customer who were apparently the intentional targets of the defendants’ deceit.
The cases cited by the People are all distinguishable. (People v Pymm, 151 AD2d 133, affd 76 NY2d 511, cert denied 498 US *470 1085; People v Dossinger, 106 AD2d 661; People v Cantarella, 160 Misc 2d 8; People v Coe, 131 Misc 2d 807, affd 71 NY2d 852; People v Smithtown Gen. Hosp., 93 Misc 2d 736.) In each of those cases, the false form submitted was either intended to deprive the recipient of a benefit it was to receive from the form, imposed a detriment on the recipient which the truthful submission of the form was intended to prevent, or eviscerated the efficacy of the form itself. Here the only alleged detriment visited on American Express was compelling it to deal with escort services which it purportedly would otherwise vigorously avoid. While the court does not suggest that American Express openly cultivates or in any manner endorses this business, the defendants have submitted evidence that numerous escort services openly advertise in print, touting that they accept American Express (along with other specified credit cards), and also often mention that they have discreet billing. Under these circumstances, these counts are dismissed.
MONEY LAUNDERING
Defendants next challenge counts two through five, the money laundering counts, on a simple technical point. The money laundering statute provides:
“A person is guilty of money laundering in the second degree when that person exchanges or receives in exchange, in one or more transactions, one or more monetary instruments which are the proceeds of specified criminal conduct and have a total value exceeding ten thousand dollars for one or more other monetary instruments and/or equivalent property when that person knows that the monetary instrument or instruments exchanged or received in exchange are the proceeds of any criminal conduct and that person:
“1. intentionally makes the exchange to conceal or disguise the nature, the location, the source, the ownership, or the control of such proceeds; or
“2. intentionally makes the exchange to aid himself or another person to commit or profit or benefit from specified criminal conduct”. (Penal Law § 470.10.)
As set forth in the Practice Commentaries to Penal Law article 470, the essential conduct involved in money laundering is the exchange of certain forms of ill-gotten money for other forms of money or equivalent property. (Donnino, Practice Commentaries, McKinneys Cons Laws of NY, Book 39, Penal Law art 470, at 582.) Usually, cash is the medium of money laundering, but it need not be. Here the allegation is that credit with *471 American Express was obtained, through which American Express would give checks and electronic deposits to the limousine companies, which would then give checks to defendant Carlyle, the escort service. The defendants’ point is a technical one, that checks are not monetary instruments within the meaning and intent of the statute. The People argue that the statutory definition of “monetary instrument” includes “coin and currency of the United States or of any other country; bank checks; traveler’s checks; money orders; and investment securities and negotiable instruments in such form that delivery is sufficient to pass title.” (Penal Law § 470.00 [1].) Here, however, the checks at issue were none of these; they were personal business checks. The equivalent Federal statute tracks the State definition almost precisely (see, 18 USC § 1956 [c] [5]), except the Federal statute explicitly includes “personal checks”. While the People assert that this was a mere oversight and the Legislature intended to include personal checks, the court cannot agree. The inclusion of bank checks, which are independent obligations of the bank issued on behalf of, in some instances, an anonymous remitter, shows that the Legislature focused on the issue of checks, but deliberately excluded personal checks. The instruments here are not bank checks.
It is true, as the People argue, that checks are negotiable instruments, but this is irrelevant because mere delivery of such a check is not sufficient to pass title, as the statute requires. The purpose of the money laundering statutes is to prevent criminals from moving the profits of criminal activity into one or more anonymous forms of consideration. Each of the items included in the statute qualifies as anonymous financial consideration, but a personal check does not. Not only is its provence traceable, but it may not be converted to cash without endorsement, literally a signature. (UCC 3-202.) A personal check (except perhaps one drawn to “cash”) may not be effectively passed without such identifying endorsement. Accordingly, these counts must be dismissed.
SELECTIVE PROSECUTION
This leaves count one, promoting prostitution in the third degree. The defendant charges that this is a case of impermissible selective prosecution. The court denies this motion for the following reasons. The facts described above, if true, present a shocking abuse of the law enforcement procedures, which may hinder the People as they continue this prosecution. However, that does not mean that this case should be dismissed, to the *472 extent it addresses criminal activity. The defendant alleges this is a blatant case of impermissible selective prosecution, that hundreds of escort services operate openly, even advertising on cable and the yellow pages, and that nobody is prosecuted, except in this instance. The defendant alleges that this is merely prosecution by vendetta. Detective Luisi asserted his Fifth Amendment rights when questioned about this case. This is reprehensible but it is not a denial of equal protection under the Constitution.
The People deny many of these allegations and advise that they do prosecute other escort services from time to time, subject to available resources. The burden of proving a claim of discriminatory law enforcement is a heavy one. Common sense and public policy dictate this. The presumption is against a claim of discriminatory enforcement. (Matter of 303 W. 42nd St. Corp. v Klein, 46 NY2d 686.) Mere selective enforcement itself, moreover, is not enough. The disparate impact must be the result of evil intent. (Matter of 303 W. 42nd St. Corp. v Klein, supra.) Such evil motive must be an illegitimate reason offensive to our notions of fair play and equal treatment. (People v Goodman, 31 NY2d 262.) While Zerin may have acted for personal motives, each day informants provide tips and the People act without having to ascertain the informant’s motives. Nor does Luisi’s conduct prove selective prosecution. While many escort services may go unprosecuted, when a specific complaint is made and the People act, a defendant cannot be heard to complain. Under these circumstances, defendants have not shown, for example, that they were prosecuted for conduct, which is overlooked in others, because of their race or religion, or gender.
Nor does the fact that it is alleged that Luisi was bribed by Zerin change the result. There is no fact-based allegation that once the District Attorney became involved, they acted in any manner other than according to their normal practices or that they were in any manner corrupted. A hearing is required only in those circumstances where a probability of success has been demonstrated. That is not the case here. This motion is denied.
SEARCH WARRANTS
The defendants next allege that there was no probable cause to issue the search warrant for Carlyle’s office or Ms. Keller’s home. The only basis to obtain a hearing is by attacking the veracity of the affiant or that the affidavit does not establish probable cause on its face. While defendants argue that *473 there was nothing in the supporting affidavits concerning sex for money, the undercover officer testified (and a videotape was obtained) about hiring the escorts for a fixed price, then discussing condoms and the business arrangements in the event the officer “consummated” (a euphemism for the explicit sexual terminology actually used) their encounter in less than his allotted hour. This constitutes probable cause. Further, there was sufficient evidence presented to justify execution of the warrant at each of the named locations. As for the detention of Sue Keller and the search of her bag, the People have consented to a hearing on this matter.
CORROBORATIVE EVIDENCE
As for the defendants’ argument that there was not adequate corroborative evidence for the testimony of customers, phone managers and escorts, the physical evidence is adequate corroborative evidence for Grand Jury purposes. The corroboration required need not verify every part of the accomplice’s testimony but must be enough to connect the defendants to the crimes so as to reasonably convince a jury that the accomplice testified truthfully. (People v Wheatman, 31 NY2d 12.)
GRAND JURY PRESENTATION
The defendant seeks inspection and dismissal of the indictment on the grounds that the evidence was not fairly presented nor sufficient to establish the offenses charged. The court has read the Grand Jury minutes and finds that the presentation was fair, the evidence sufficient, that at least 12 grand jurors who heard all the essential and critical evidence voted and that the Grand Jury was properly instructed on the law. The court finds there was no exculpatory evidence which should have been presented to the Grand Jury that had been withheld. The defendants make various allegations of claimed improprieties before the Grand Jury. However, the defendants have presented nothing but speculation to support their claim. Not only are Grand Jury proceedings presumed to be regular but a reading of the minutes show that due care was exercised in maintaining a proper presentation.
The application for the release of the Grand Jury minutes is denied.
The defendant’s motion for bills of particulars and discovery is granted to the extent it has been responded to by the People. Defense counsel should first contact the Assistant District Attorney regarding any matters needing a more complete answer. *474 If the issue still remains unresolved, defense counsel should bring it to the court’s attention for an appropriate decision.
The People are reminded of their continuing duty to supply all Brady material.
The Sandoval and Ventimiglia (People v Ventimiglia, 52 NY2d 350) motions shall be heard immediately preceding the trial.
The defense is directed to respond to the prosecutor’s demand for reciprocal discovery.
INTEREST OF JUSTICE
The defendants move to dismiss in the interest of justice. (CPL 210.40.) The court is obligated to consider various factors in assessing such a motion. These are:
“(a) the seriousness and circumstances of the offense;
“(b) the extent of harm caused by the offense;
“(c) the evidence of guilt, whether admissible or inadmissible at trial;
“(d) the history, character and condition of the defendant;
“(e) any exceptionally serious misconduct of law enforcement personnel in the investigation, arrest and prosecution of the defendant;
“(f) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;
“(g) the impact of a dismissal upon the confidence of the public in the criminal justice system;
“(h) the impact of a dismissal on the safety or welfare of the community;
“(i) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion;
“(j) any other relevant fact indicating that a judgment of conviction would serve no useful purpose.” (CPL 210.40 [1].)
While defendant argues that the crimes charged are petty and essentially victimless, in fact, to the extent guilt is proved, defendants knew that the activity was illegal, and deliberately chose to pursue it on a large scale for enormous profits. The motion is denied.
SEIZURE OF EVIDENCE BY ZERIN
Next, defendants challenge the seizure by Zerin of credit card slips placed by Miller in a drawer in Zerin’s apartment which she shared with him. A defendant, to have standing to *475 object to a search and seizure, must establish a legitimate expectation of privacy in the premises or object searched. (People v Ramirez-Portoreal, 88 NY2d 99.) Defendants had no expectation of privacy in Zerin’s apartment, or that their privacy interests would be protected there. (United States v Padilla, 508 US 77; People v Gamble, 182 AD2d 703, lv denied 80 NY2d 929.) Since the corporate defendant did not dictate or control the manner in which Miller handled or disposed of its property, it did not have an expectation of privacy in the places she put such property. (See, G. M. Leasing Corp. v United States, 429 US 338; United States v Chuang, 897 F2d 646.) The motion is denied.
Finally, the defendants argue that the People improperly utilized immunized testimony, but there is nothing to support this assertion other than pure speculation. No hearing is warranted. To the extent any issues have not been specifically addressed here, they are denied.
Defendants’ motions are granted in part and denied in part. Counts six and seven charging the defendants with falsifying business records in the first degree are dismissed. Counts two through five charging the defendants with money laundering in the second and third degrees are dismissed.